[Cite as *In re P.L.*, 2023-Ohio-3701.]

STATE OF OHIO        )
                )ss:
COUNTY OF SUMMIT    )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: P.L.
      P.L.

C.A. Nos.    30621
                 30622

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.   DN 21 02 0142
               DN 21 02 0143

DECISION AND JOURNAL ENTRY

Dated: October 11, 2023

STEVENSON, Judge.

**{¶1}** Appellant, P.L. ("Uncle"), a third-party intervenor in the trial court proceedings, appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed two minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

**{¶2}** Uncle is the paternal uncle of P.L., born February 13, 2019, and the alleged paternal uncle of the child's younger sibling, also with the initials P.L., born February 2, 2021. The children's parents ("Mother" and "Father") did not attend the permanent custody hearing and have not appealed from the judgment. Father, Uncle's brother, is the established father of the older P.L. and is believed to be the father of the younger P.L., but he did not establish his paternity during the trial court proceedings.

{¶3} During another juvenile case that CSB filed in 2019, the juvenile court adjudicated the older P.L., then an infant, and Mother's two older children as dependent because of concerns about the parents' mental health, substance abuse, criminal involvement, and their failure to provide for the children's basic needs. Mother and Father failed to resolve their parenting problems during that case, so the court did not return the children to their home. Instead, it placed Mother's two oldest children in the legal custody of their father and the older P.L. in the legal custody of his paternal grandmother ("Grandmother").

{¶4} This case began shortly after the younger P.L. was born because CSB received a referral about Mother using illegal drugs during her pregnancy. Upon further investigation, CSB learned that Grandmother had recently died and that the older P.L. had been living with Uncle, who had no legal authority as the child's caregiver. Uncle was still residing in the home that had been owned by Grandmother, which would eventually pass to him and his siblings through Grandmother's estate. CSB filed dependency complaints and sought emergency temporary custody of both children because of the parents' prior children services history; their ongoing mental health, substance abuse, and criminal involvement; and the recent death of Grandmother. At the time this case began, Father was incarcerated on an unidentified felony conviction and Mother was out on bond while facing charges for felonious assault.

{¶5} The trial court later adjudicated the children dependent and placed them in the temporary custody of CSB. Within two weeks, Uncle and Grandmother's former home were approved for placement of the children. The children were placed with Uncle and lived with him for almost one year during this case.

{¶6} The initial case plan was prepared while Father was still incarcerated. It provided that Mother could have weekly, supervised visitation with the children in an agency setting. The

parents did not work on the case plan, nor did they maintain contact with the caseworker or guardian ad litem. Father was released from prison several months after this case began, but he never contacted the caseworker. Because the parents' unresolved problems remained a threat to the children, they were not allowed to have any unsupervised contact with the children.

{¶7} After Father was released from prison, although he never contacted CSB to establish his paternity or request visitation, the trial court issued an order that permitted the parents to have visitation with P.L. and P.L. "at the discretion" of CSB and the guardian ad litem. The caseworker and the guardian ad litem did not support either parent having unsupervised visitation because they had not worked with the agency to resolve any of their parenting problems.

{¶8} The caseworker repeatedly explained to Uncle that parental visits were required to take place at Uncle's home, the CSB visitation center, or at an approved location in the community; and that all visits had to be supervised by Uncle, a CSB staff member, or another adult approved by CSB. Shortly after Father was released from prison and unbeknownst to CSB, however, Uncle allowed both parents to have some visits with the children that were not supervised by an approved adult and/or occurred at locations that CSB had not approved. Uncle apparently believed that Father and Mother were doing better, even though they were not working on the case plan or maintaining contact with the agency.

{¶9} CSB had initially moved for the children to be placed in Uncle's legal custody but withdrew the motion and removed the children from Uncle's home shortly afterward because it learned that Uncle had repeatedly allowed the children to have unauthorized visits with Mother and/or Father. Significantly, during a multi-day visit with Father that was both unsupervised and at an unapproved location, P.L. and P.L., then ages one and three years old, gained access to a

loaded firearm. While they played unsupervised with three other young children in the home, one of the five children shot and seriously injured another child in the home.

{¶10} On February 9, 2022, CSB moved for permanent custody of both children. The juvenile court later granted Uncle's motion to intervene as a party and Uncle alternatively moved for the children to be placed in his legal custody. Following an evidentiary hearing on the competing dispositional motions, the trial court terminated parental rights and placed P.L. and P.L. in the permanent custody of CSB. Uncle appeals and raises two assignments of error, which will be addressed together.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DENYING THE THIRD-PARTY DEFENDANT'S MOTION FOR LEGAL CUSTODY.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY DISMISSING THIRD-PARTY DEFENDANT'S MOTION FOR LEGAL CUSTODY AS THE RULING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶11} Uncle's second assignment of error refers to the trial court's act of "dismissing" his motion for legal custody, but the trial court did not dismiss his motion. The court denied his motion for legal custody and both assignments of error challenge that decision, based on the evidence before the trial court. Consequently, this Court will address the assigned errors together.

{¶12} Uncle challenges the trial court's decision to deny his legal custody motion and instead grant CSB's motion for permanent custody of both children. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12

months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶13} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶14} The trial court found that the first prong of the permanent custody test was satisfied in this case for several alternative reasons, including the grounds set forth in R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1). Those provisions together provide that the child "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents[]" if the trial court finds, by clear and convincing evidence, that "[f]ollowing the placement of the child outside the child's home * * *, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed

outside the child's home." Uncle does not dispute this finding, which is fully supported by the record. In fact, the parents did virtually nothing to address their parenting problems, did not maintain contact with the agency or their children, did not attend the permanent custody hearing, and have not appealed that judgment. Father, who has a lengthy criminal history and had recently been released from a period of incarceration, was again facing felony charges following the shooting incident in his girlfriend's home.

{¶15} Uncle challenges the trial court's finding that permanent custody was in the best interest of the children. He contends that the trial court should have instead placed the children in his legal custody, which will be discussed in more detail below as this Court has held "that if permanent custody is in the best interest of the child, legal custody to a relative necessarily is not." *In re M.S.*, 9th Dist. Summit Nos. 30506 and 30515, 2023-Ohio-1558, ¶ 26. This Court's best interest review focuses on the best interest factors set forth in R.C. 2151.414(D). In making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply.[1] R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶16} Uncle focuses his argument primarily on his interaction and close familial relationship with the children. The evidence was clear that, during most of this case, Uncle's interaction and interrelationship with the children had generally been positive. The children had lived with him for an extended period and were closely bonded with him. Although CSB expressed

---

[1] The trial court did not find that any of those provisions applied to the facts of this case.

concerns that there had been delays in enrolling the older P.L. in intervention services to address his developmental delays, it was not clear from the record that the delay was entirely attributable to Uncle, as some of the delay in obtaining services for the child was due to a backlog of cases at the facility that would assess the child to determine his specific developmental delays and intervention needs.

{¶17} In addition to considering Uncle's bond with the children, however, the trial court was required to consider "whether it was in the best interest of the children for their parents to maintain residual parental rights." *In re I.R.*, 9th Dist. Summit Nos. 30500, 30501, 30502, 30529, 30530, and 30531, 2023-Ohio-3044, ¶ 36. Given that the parents had no relationship with the children and had made no efforts to be reunited with them, the trial court reasonably considered that evidence in determining whether this is a family relationship that should be preserved. *Id.* at ¶ 37. Moreover, given that the parents have extensive histories that pose a threat to the children, any preservation of residual parental rights in this case "would necessarily require assurances that the children would be protected from their parents[,]" particularly Father, who is Uncle's brother and had seen the children without supervision and exposed them to the risk of serious harm. *Id.* at ¶ 38.

{¶18} The reason that CSB and the former guardian ad litem no longer supported Uncle receiving legal custody of the children was Uncle's failure to follow the visitation rules that were specifically designed to protect these children from their parents. If Uncle were to receive legal custody of the children, Mother and Father would retain "residual" parental rights, privileges, and responsibilities, which include "the privilege of reasonable visitation[.]" R.C. 2151.353(A)(3)(c); R.C. 2151.011(B)(50). The trial court would still have the authority to "limit or even prohibit parental visitation" with the children if it determined that such interaction may be detrimental to

the children. *In re C.T.*, 9th Dist. Summit No. 30156, 2022-Ohio-3464, ¶ 17. The parents had not remedied any of their parenting problems, so the trial court would necessarily impose restrictions on any parental visitation for the foreseeable future.

{¶19} During this case, however, Uncle failed to demonstrate that he would follow the rules pertaining to the parents' visitation with the children. When the caseworker first learned that Uncle had allowed one unsupervised visit, at a place that had not been approved by CSB, she reminded Uncle that he did not have the authority to ignore the supervision and other safety requirements that CSB and the guardian ad litem had placed on the parents' ability to visit the children. She emphasized to Uncle that the parents had serious drug and criminal problems and that they continued to pose a safety risk to these very young children. Uncle told the caseworker that he understood these restrictions. Although Uncle disputed at the hearing that the caseworker had repeatedly told him that unsupervised visits were prohibited, he did not deny that the caseworker had communicated that restriction to him after she learned about him allowing one unauthorized visit.

{¶20} A few weeks later, however, Uncle allowed the children to go with Father, without an approved adult supervising, for a multi-day visit at the home of Father's girlfriend. Neither the girlfriend nor her home had been approved for P.L. and P.L. to visit. On the second or third day of their unauthorized visit, a serious incident occurred that caused CSB to remove these children from Uncle's care. While in the home of Father's girlfriend, P.L. and P.L. were playing with three other young children in the home, apparently without being supervised by any adults in the home. One of the five children somehow found an unsecure, loaded firearm and shot the girlfriend's two-year-old child, causing the child to sustain serious injuries. The firearm apparently belonged to Father, who was later charged with child endangering.

**{¶21}** The record in this case does not include many details about the shooting incident, including which child shot the gun and/or whether an adult intervened to take the gun from the child to prevent additional injuries. The caseworker later spoke to Uncle about the tragic consequences of his poor decision to allow the children to have unsupervised contact with Father in a home that had not been approved for visits. Although Uncle was unaware that Father had a loaded and unsecure firearm in the home or that five young children would be allowed to play without adult supervision, P.L. and P.L. would have been protected from that situation if he had followed the visitation rules.

**{¶22}** After discussing the serious nature of this incident with Uncle, the caseworker was concerned that he did not express remorse or accept responsibility for the children's exposure to the disturbing event. More significantly, she opined that Uncle did not seem to understand the gravity of the situation. P.L. and P.L. experienced the trauma of witnessing a young child being shot and seriously injured, something they could not understand or emotionally process at the ages of one and three years old. It is also possible that it was one of them who pulled the trigger, thereby enduring additional trauma. Moreover, either or both could have been seriously injured and/or killed during that incident. Despite Uncle allowing the children to be exposed to emotional trauma and a serious risk of physical harm, Uncle referred to his decision to allow the children to attend that multi-day visit with Father as a "lapse in judgment."

**{¶23}** The former guardian ad litem, who was assigned to this family's case at that time and for over two years, explained that, although she had initially supported Uncle receiving legal custody of the children, she had been unaware that he had allowed them to have unsupervised contact with Father. She explained that, even if no tragic incident had occurred while the children were with Father, she would not have trusted Father to be alone with the children, given his

extensive criminal and drug abuse history and his failure to take any steps to comply with the reunification requirements of the case plan.

**{¶24}** Given the evidence before the trial court about Uncle's inability to appropriately monitor parental visitation with these children, Uncle has failed to demonstrate that the trial court lost its way in terminating parental rights and denying his motion for legal custody. Uncle's assignments of error are overruled.

### III.

**{¶25}** Uncle's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

HENSAL, P. J.
CARR, J.
CONCUR.

APPEARANCES:

JEFFREY V. HAWKINS, Attorney at Law, for Appellant.

KENNETH C. MARTIN, Attorney at Law, for Appellee.

SHERRI BEVAN WALSH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.

JOSEPH KERNAN, Guardian ad Litem.